### ORDER

**In re N.J.H.**

*Anne L. Cooper,* for Children and Youth.

*Heather Mumma Harner* guardian ad litem, for N.J.H.

*Farley G. Holt,* for Mother.

GORBEY, *J.,* January 2, 2008—

## PROCEDURAL HISTORY

On March 29, 2007, the Lancaster County Children and Youth Social Services Agency filed a petition to terminate the parental rights of R. N. S. (Mother) and L. J. H., Sr. (Father) to their son, N. J. H. (N.). A hearing scheduled for May 31, 2007 was continued to two hearing dates, July 13 and July 20, 2007. On June 18, 2007, the hearing scheduled for July 20, 2007 was rescheduled for, and then held on August 8, 2007. A decree was issued on October 1, 2007, terminating Mother's and Father's parental rights to N. Mother appealed the order of October 1, 2007 to the Superior Court on October 30, 2007. On the same day, this court issued an order for Mother to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) and for opposing counsel to file an answer thereto by December 4, 2007, which documents were timely filed.

## FACTUAL HISTORY

N. J. H. was born on January 10, 2005. (N.T. 6, 7/13/07 a.m.) The agency's initial contact with Mother and N. was on December 21, 2005, when a call came in to the agency about Mother's drug use. (*Id.* at 9.) N.'s maternal

grandmother later testified that she made the call because she had found drug paraphernalia in Mother's room in her house and Mother's crack cocaine use had become so problematic. (N.T. 65, 7/13/07 p.m.) Grandmother asked Mother to move out of her house and Mother moved to an apartment in Peach Bottom, PA. Mother saw an agency caseworker for the first time on December 23, 2005. She denied drug use, but admitted taking Methadone for back pain. (N.T. 11, 7/13/07 a.m.) When her first caseworker, Theresa Gamber, paid her a visit on December 23, 2005, she found Mother's prescription bottle empty. The prescription had been filled on December 15, 2005 for 60 pills and was empty on December 23. Mother told her she kept the rest of the pills in a locked box, but refused to show it to Gamber. (*Id.* at 30.) When asked why she didn't show Theresa Gamber her pills, she said that she didn't think it was right for somebody to come into her house and tell her she has to show her medication to them. (N.T. 77, 8/8/07.) Mother admitted that sometimes she takes more than the prescribed amount of medication because of the pain. (N.T. 30, 7/13/07 a.m.) At the first visit, Mother refused to sign both a release for her landlord to provide the agency with information, and a safety contract with the agency which stated that she would comply with random drug tests, refrain from substance abuse, have an assessment done and follow recommendations. (N.T. 11-12, 7/13/07 a.m.) On December 28, 2005 both Mother and Father refused to go for drug screens, or sign releases and the safety plan. When the caseworker went to Mother's house to keep a scheduled January 5, 2006 appointment, no one was home. The agency filed

a petition for legal custody and protective supervision on January 9, 2006. (*Id.* at 13-14.) The parents subsequently agreed to sign all documents and releases. (*Id.* at 15.) Mother was drug tested on February 7, 2006 and the result was positive for cocaine. She failed to attend a scheduled drug and alcohol evaluation on February 8, 2006. (*Id.*) She again tested positive for cocaine on February 16. N. was placed in foster care on February 14, 2006. On March 6, Mother went to a drug and alcohol assessment, but refused a drug screen. (*Id.* at 16-20.) On April 7 another drug screen was positive for cocaine. On March 24, 2006 Mother signed herself into Bowling Green Inpatient Hospital for drug and alcohol treatment. On March 31, she signed herself out against medical advice, because, she testified, they refused to give her something to help her sleep. (*Id.* at 21; N.T. 100, 7/13/07 p.m.)

Mother then had a long history of missed appointments with various agencies and either negative or refused drug screens. After Bowling Green, she started treatment at HSA Drug and Alcohol Treatment pursuant to a recommendation that she have intensive outpatient treatment. (N.T. 35, 7/13/07 a.m.) She missed an appointment on April 28, 2006 and a group session on May 10, 2006. She was discharged from the program. On May 24, 2006 she met with the director of HSA in order to be admitted back into their program. She then missed another appointment and met with the director again. She missed two appointments in July of 2006, was again discharged, and never went back. She had been dismissed by the Family Alternatives program for missing counseling and having positive drug screens. (*Id.* at 37-38.)

She was then evaluated by Josephine Kalista, a counselor at Adams Hanover Counseling Service in York, PA on October 2, 2006. It was recommended that she attend group and individual sessions on a weekly basis. (*Id.* at 38.) She had difficulties participating in the group sessions and was removed from them in March of 2007, but continued seeing Kalista on a one-to-one basis. (N.T. 4-5, 7 /13/07 p.m.) She saw her three times in March of 2007 but then cancelled her last session for the month. She was seen only one time in April of 2007 and one time in May. (*Id.* at 5, 7.) Then things slacked off further because of Mother's work schedule and Kalista's being away because of a death in her family. (*Id.* at 5.) At the July hearing, Kalista had not seen Mother since her single May appointment. (*Id.* at 29.) Despite the low number of sessions Mother attended, Kalista informed the court that Mother was making great progress in individual counseling. (*Id.* at 16.) However, most of her information consisted of self-reporting from Mother. Kalista was not aware that the agency had asked Mother to do a drug screen on June 26, 2007 and Mother had refused. (*Id.* at 28.) She had not spoken with Mother's physician. (*Id.* at 32.) She was not aware that Father had a drug history or that he might well be a trigger person for Mother's addictive behavior.[1] (*Id.* at 34-39.) The basis for her positive opinion that Mother was not at risk for medication addiction was that the drug results she had seen were negative. (*Id.* at 29.) However, those screens that came to her attention did not test for Meth-

---

1. Part of Kalista's therapeutic approach was making Mother aware of "triggers" which consist of people, places, or experiences which might cause her to begin her drug use. (N.T. 15, 7/13/07 a.m.)

adone. (*Id.* at 61.) Mother testified that she had been discharged by Kalista after successfully completing the program. (N.T. 51, 8/8/07.) However there was nothing in writing for the court to read, and although Kalista was optimistic about Mother, there is nothing in her testimony that supports such a precipitous discharge immediately after so many absences. (N.T. 15, 7/13/07 p.m.)

Kalista expressed concern about management of an addict taking Methadone along with other drugs and told the court that Methadone is a difficult drug to get off of. Kalista had worked in a Methadone clinic in Baltimore and reported that a lot of addicts would take other pills to get a high. (*Id.* at 22-23.) Mother was taking and continues to take Methadone. At some point in the past, she obtained her Methadone off the streets. (N.T. 29, 7/13/07 a.m.) Then, with Father's help, she found a Dr. Jackson in Havre de Grace, MD, who prescribed Methadone for her as a remedy for back pain. (N.T. 23, 8/8/07.) Something caused Dr. Jackson to leave practice abruptly without appropriately transferring his records to another physician. Mother and Father found a Dr. Dinesh Shah, also in Maryland, who now treats many of Dr. Jackson's patients. In Mother's case, without all of her previous records, and without ordering any new diagnostic tests, Dr. Shah prescribed Methadone for mother on her first visit. (N.T. 10, 14, 36, 8/8/07.) He sees her every month, at which time he gauges her progress through her self-reporting, and gives her a new prescription for a month's supply of Methadone. (*Id.* at 24.) In Methadone clinics such as the one Kalista worked at in Baltimore, patients are given a urine test and a breathalyzer every time they get Methadone. (N.T. 22-23, 7/13/07 p.m.) But Dr. Shah

does no drug screens, no physical tests to gauge her progress, no physical therapy and, when Mother complained that her pain was worse, he added some Oxycodone for break-through pain. (N.T. 21, 25, 32, 8/8/07.) Oxycodone is similar chemically to Oxycontin, which Mother told him she had abused in the past. (*Id.* at 32-33.) He was not in touch with her addictions counselor. He did not order any subsequent MRIs. (*Id.* at 20.) He testified that he has a "gut feeling" that Mother is not addicted to Methadone, but has not tried reducing her medication. (*Id.* at 26.) Dr. Shah charges $70.00 for an office visit and prescription for Methadone. (*Id.* at 24.) He has not performed drug tests, because she tells him she is being tested elsewhere, although he has received no test results. (N.T. 35.)[2]

Mother's first goal as set out on her child's permanency plan is dealing with her drug addiction. (N.T. 35, 7/13/07 a.m.) Her results for drug screens remained spotty during her connection with the agency. She tested positive for opiates on April 12 and April 20, 2006. She refused a screen on May 1, 2006, saying she had smoked crack two days earlier. On May 17, May 24, and June 5, 2006, she had negative drug screens, but on June 12, 2006 she tested positive for cocaine. A June 26 test was negative, but a July 10, 2006 test was positive for cocaine. After two negative tests in late July, she refused a screen on August 7, 2006. On August 21 and September 29, she had invalid screens. On October 3, 2006, she refused a test, accusing the agency of doing something to the tests to make them invalid. Tests on October 17 and Novem-

---

2. Father also consults Dr. Shah for self-reported pain and had been placed on a similar drug regimen. (N.T. 20.)

ber 14 of 2006 were negative, but on November 28, 2006 she refused a screen because it would be supervised by someone in the bathroom with her. On December 8, Mother's counselor told her to go for a screen, but she did not do so. January 23, February 6 and February 28, 2007 produced negative screens. On March 13, 2007 she did not show up for a screen, but on April 12 she had a negative screen. After that she missed a couple of appointments for screens. On June 26, 2007 she refused a screen at the agency. (N.T. 42-45, 7/13/07 a.m.) During the summer of 2007, she missed two appointments, missed two urine tests and two case management meetings on July 26 and August 2 at the TASC program, a drug testing agency to which she had been sent by Kalista. (N.T. 68, 8/8/07.) She admitted that although she missed visits with her child and therapy sessions because of transportation problems, she never missed an appointment with Dr. Shah to get her Methadone prescription. (*Id.* at 64.) The agency believes she has not completed her first goal of conquering her drug addiction. (N.T. 46, 7/13/07 a.m.)

The second goal that she had to demonstrate to have her child returned was stable mental health, which was initially addressed by a psychological evaluation by Dr. John Weigle on September 18, 2006. (N.T. 46, 7/13/07 a.m.) He recommended that she maintain sobriety, continue her drug and alcohol counseling, participate in couples' therapy with Father, become more settled in her life and obtain another medical opinion about taking Methadone. (*Id.*) She did not get a second opinion about the Methadone, but because she had seen Dr. Jackson before Dr. Shah, she considered Dr. Shah her second

opinion. (N.T. 117, 7/13/07 p.m.) She and Father did not go for couples counseling because she says they have broken up, although her lease is in his name and he pays her bills. (*Id.* at 48.) She calls him her boyfriend in her sessions with Kalista. (N.T. 84, 7/13/07 a.m.) The agency considers she has not completed her second goal. (*Id.*)

Her third goal is maintenance of a violence free relationship. Mother and Father have a history of violence. (*Id.* at 49.) In April of 2006, Mother reported that Father had assaulted her at a bar and she subsequently pressed charges. (*Id.* at 85.) Mother did attend a domestic violence education group, but she continued to live with Father, who had engaged in seriously violent behavior toward her, after finishing that class. It is still not clear what relationship she and Father have. As noted above, he is the sole lessee on her lease and pays many of her bills. She told Kalista that they are still together and calls him her boyfriend. (N.T. 84, 7/13/07 a.m.)

Mother's fourth goal is stable housing. (*Id.* at 49.) She was evicted from the Peach Bottom apartment in May of 2006. Although she reported that she was staying in a trailer on Father's father's property, she was really living with her mother, and lied to the agency about that. On July 21, 2006, she and Father were arrested at Grandmother's house. After that she stayed with her brother briefly and then in November, 2006, she moved into a two bedroom trailer leased in Father's name. (*Id.* at 49-51.) Because of Father's drug use and violent behavior, and his refusal to address his child permanency plan, he cannot live in a residence with the child. Although

she insists she is living alone, the extent of their relationship is questionably uncertain. (*Id.* at 53-54.)

Mother's next goal is a stable source of income. As of the first hearing on July 13, Mother was working at a grocery store. As of the last hearing on August 20, she had quit that job and was starting to work at Wal-Mart as a sales associate on the day of the hearing. She also planned on beginning another job she had acquired at a chemical distribution company for which she was to go through orientation the following Wednesday. She was not sure whether she would stay at Wal-Mart or not. (N.T. 45, 8/8/07.)

N. has been in a pre-adoptive home since August 14, 2006. Mother visits with N. for an hour every other week, sometimes with Father. At visits N. appears to have a good time. He is generally shy at the beginning of the visits, and sometimes clings to his foster mother or father. (N.T. 64, 7/13/07 a.m.) Although he seems to enjoy playing with Mother, he doesn't get upset at the end of the visit when he has to separate from her and goes back to his foster/adoptive parents easily. He interacts well with his foster parents and is extremely attached to them. He is by this time a member of their family. If he is upset or hurt or tired, he goes to them for comfort, as is normal with a young child and his parents. The agency believes that he would not be harmed by being adopted, but would be harmed by the emotional wrench if he were to be removed from his foster parents. (*Id.* at 67.)

## ISSUE

(1) Whether it is appropriate to terminate a mother's parental rights to her 3-year-old son when he was taken

from her at 1 year of age because of her drug use, lack of stable housing and employment and cohabitation with a man who also used drugs and treated her violently, when she continues two years later to take Methadone regularly, still lives in a house leased and paid for by the same man, who refused to complete his child permanency plan, appears to still have a relationship with him, and cannot show a successful work history.

## DISCUSSION

The Adoption Statute, 23 Pa.C.S. §2511 (Grounds for involuntary termination) provides, inter alia, that parents rights may be terminated on the grounds that "the child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S. §2511(a)(8).

In making its decision under that section, the court must give primary consideration to the developmental, physical and emotional needs and welfare of the child.

N. was originally placed into foster care on January 9, 2006 because of his mother's and father's addiction to drugs and failure to cooperate with the agency. Mother has had a long history of Methadone and cocaine abuse. The court finds that her condition persists because of her continuing dependence on Methadone and will not be improved in the foreseeable future, since Mother insists that she takes Methadone only for pain and will not admit her dependency. However, she has been neither

monitored during her treatment or tested for the substance. Also, she refused a drug test as late as June of 2007, indicating to the court her concern that something else disadvantageous to her would be revealed. It is clear that Mother does not yet have her drug problem solved.

Since N. was taken from her almost two years ago, Mother has been involved with a number of agencies who have attempted to provide her with help in alleviating her addiction problems. First, of course, was the Lancaster County Children and Youth Social Service Agency, which did not succeed in its endeavors to help Mother achieve sobriety. Then, she was an inpatient at Bowling Green and left against medical advice. She was referred to Family Alternatives for services connected to her drug use and was discharged for missing counseling and having positive drug screens. She attended and then was discharged for a third and final time from HSA Drug and Alcohol treatment for missing appointments. She has been in counseling with Josephine Kalista, who, although optimistic, was without all of the relevant facts. Not one therapeutic entity has credibly concluded that Mother has succeeded in conquering her addictions.

Highlighting the problem is Mother's ongoing experience with Dr. Dinesh Shah, an internist who, without diagnostic tests, past history, or apparent concern for risk to his patients, provides Mother with Methadone on a regular basis. The court is outraged at the apparent lack of ethical considerations which permit Dr. Shah to cavalierly hand out Methadone to a drug addict without first obtaining necessary information or utilizing appropriate safeguards. Mother self-reported her pain to Dr. Shah,

who did nothing to medically corroborate it. There was no objective evidence before the court as to the extent of Mother's pain, or whether she in fact has pain that requires opiates. It appears to the court that Dr. Shah is effectively giving Methadone to anyone willing to say that he or she experiences unremitting pain and willing to pay him the cost of a consultation and prescription. Mother is on a regular regimen of Methadone which Dr. Shah shows no sign of weaning her off of. To make things worse, there have been indications that Mother may not be adhering to the prescriptions, but is taking the medications at a faster rate than indicated. Also, Dr. Shah is also providing Oxycodone to Mother for breakthrough pain, and there are indications that Mother is also taking that medication more quickly than the prescription directs. Various counselors and caseworkers have attempted to convince Mother to get a second opinion about the Methadone treatment. She has not done so. Mother is clearly addicted to Methadone, a substance for which she is not being tested. She remains drug dependent with Dr. Shah's help. While the record indicates that transportation or work problems interfere with her keeping appointments for her drug screens, counseling or related activities and that she has missed a number of visits with her son, she has had no trouble finding transportation to Maryland to see Dr. Shah and receive a prescription for Methadone, her drug of choice. N. has been in foster care for two years and Mother has not remedied the drug difficulties that put him there.

The other difficulties of her life addressed in the permanency plan also remain. As long as she is dependent on Father for a home, she has no stable housing or normal

living expenses. If he decides to no longer take responsibility for her, she would be destitute. She told the court she has two jobs, although she is unsure of which one to keep. However, at the time of the August hearing, she had not done a minute's work at either. The job she had in July is gone after only a short period of time. The court cannot view this situation as stable employment, since there is no job history to use as a predictor. Whether Mother will be employed in the near future is a real question without a real answer. In his evaluation of Mother's mental health, Dr. Weigle made a number of recommendations, particularly the one which recommends that she receive a second medical opinion about her Methadone use. That happens to be a recommendation that the court finds of highest priority, but in the time span of over a year, she has seen no one but her Methadone dispenser, Dr. Shah. Mother has not corrected any of her problems in the way the court has directed over the last two years. More than 12 months has passed since N.'s placement, and the conditions which led to his removal from his mother continue to exist.

Mother was adamant in her testimony that she had changed her ways. She insisted that she now understands clearly the mistakes she made and will not repeat them. She professes to recognize the importance of her child to her, and while admitting that she "messed up", she is certain that she will not do so again. Given her history, the court can find no sign that Mother's good intentions have any validity. Her credibility is more than suspect. She lied to the agency about who she was living with in the summer of 2006. She keeps her relationship with Father cloudy, maintaining him solidly in her life while

asserting her independence. She insists that her employment is stable when she hasn't worked for one minute at either of her jobs, both of which she states she obtained immediately before the hearing on this matter. She denies drug use at the same time she regularly takes Methadone and other medications for pain. The court did not find Dr. Shah to be a credible medical witness in light of his procedures in prescribing drugs to drug addicts. In short, the court does not believe Mother's protestations of her reformed status without some actual experiential evidence that she is capable of maintaining stability in all of the problem areas of her life. Saying that her life has changed for the better does not make it so. She has already spent two years on this effort. The legislature has statutorily directed that 12 months from placement is long enough for Mother to correct the problems that led to placement. Mother continues to take drugs, and can show no stable housing or employment capabilities. The court believes that too much additional time will be needed to make Mother realize that something must be done and then do it. The court will not sentence N. to a life in limbo while his mother continues to live an unstable, unhealthy life and insist that everything has been corrected and life is wonderful. Mother has not changed her behavior. The statutory standard of 5211(a)(8) has been met.[3]

The court must now look at whether such a decision is in N.'s best interest. He has been with his foster parents for two years and his behavior shows that he considers

---

3. The court notes that the standards of 23 Pa.C.S. §§2511(a)(1)(2) and (5) have also been met, but need not be discussed, given the right to terminate under section (8).

them to be his parents. He is doing well with them. While Mother exhibits appropriate behavior with him during visits, he is not over-eager to see her or loath to leave her. The visits are for one hour every other week, and there was no indication that N. would be unhappy to see them end, since he apparently is not unhappy to see each individual visit end. The court sees no harm, but a great deal of good in terms of this child's best interests in terminating Mother's rights.[4] Otherwise, he will remain in limbo, seeing his addicted Mother once every other week and never being sure of where he belongs. This child deserves love and stability that Mother cannot give to him and does not seem willing to work to give to him. It would be cruel to maintain N. in his current situation without a resolution to the uncertainty surrounding his life and relationships.

## CONCLUSION

Based on the reasons set out above, R. S.'s parental rights to N. H. have appropriately been terminated.

---

4. Father's rights were also terminated in the court's order of October 1, 2007, but he did not appeal the decision.